621-5083, John-Gabriel Bernier v. Jeff Allen, Chief Physician, FBOP Appellants. Mr. Himmelfarb for the appellant, Mr. Howard for the appellant. Okay, counsel, Mr. Himmelfarb, you may proceed when you're ready. Thank you, Your Honor. May it please the court, Edward Himmelfarb of the Department of Justice, representing Dr. Jeff Allen, the Chief Medical Officer of the Bureau of Prisons. John-Gabriel Bernier is a former federal prisoner who was cured of hepatitis C while in prison in early 2017 with a direct acting antiviral drug called Zepatier. Almost five years later, Bernier is still pursuing this Bivens action because he had been turned down for a treatment a little over a year earlier based on BOP's earlier protocol, which was designed to provide treatment with antiviral drugs to those prisoners in greatest need. The two new allegations in the second amended complaint that convinced the district court to deny qualified immunity to Dr. Allen are first, that the entire BOP protocol, treatment protocol, had no medical justification whatsoever and was totally based on the cost of the treatment. And second, that Dr. Allen was personally aware of some older blood test results for Bernier from his time in state prison. Now, both of those allegations, there are two problems with each of those allegations. The first problem, if you look at the protocol allegation, the first problem is that we're talking about the Bivens action. There is no allegation in the complaint, the second amended complaint, that Dr. Allen was in any way responsible for this protocol. The protocol, if you look at paragraph 38 of the second amended complaint, which is on page 115 of the joint appendix, what it says there is that BOP was responsible for this. It uses the term FBOP, Federal Bureau of Prisons, but that's what it's talking about, that the agency was responsible for this. So since Dr. Allen is not being alleged to have created this policy, he should not be sued in Bivens. Second problem with the protocol allegation is, because we spent a lot of time in our brief talking about, that the idea is that it was somehow, the idea that it was based on cost alone and had no medical justification makes no sense in the context of the exhibits that were attached to the complaint. Those exhibits include not only the BOP protocol excerpts, which show that it had medical justifications, but the press release and the new protocol by the two medical organizations that the BOP, whose original protocol, BOP's protocol was based on. So if the medical organization's protocol on which the BOP protocol was based, in fact, the complaint says that it was analogous to the medical organization's protocols. If the medical organization's protocol was based on medical justification, then it necessarily follows that the BOP protocol was based on a medical justification. I'm not so sure about that, Mr. Himelfar, because there isn't any allegation or suggestion that the reason the medical association said to direct it to the sickest was to direct it to the people who would most benefit or to ration it because of any shortages of availability of the direct acting antiviral or because of shortages of staff. The reason, the only reason I see in the incorporated document is that the direct acting antiviral drug, there were concerns about safety that had not been adequately dispelled. And in its 2015 announcement, the medical associations explained, we need to gain experience with their safety. We needed to gain experience with their safety before we encouraged all infected persons to initiate therapy. So it made sense, if you're worried about the safety of a drug, you might be willing to prescribe it to people who are really on the brink of death. And you might not be willing to prescribe it more broadly because its risks to the health of patients are greater than its potential benefit. And then what happened in, as I understand it in 2015 is that the medical associations gained confidence that it wasn't risky and therefore should be made available to everyone else. So once that's been announced, it seems to take away the medical justification, which was that kind of cost benefit. That's shifted that completely. So continuing to rely on it might, there might be other reasons, but the fact that the prior medical consensus tracked what BOP continued to do does not seem like sufficient support for your position. Well, Your Honor, there are a couple of things in response to that. One is if you look at Exhibit C, the press release accompanying the new protocol for the medical organizations in October, 2015, it says, because of the cost of the new drugs or regional availability of appropriate healthcare providers, a practitioner may still need to decide which patients should be treated first. Right, but that's a different point. That's a new and different argument from the one that they note above that they had relied on. And we don't have any information at the pleading stage, whether the Bureau of Prisons was making decisions on either of those grounds. We don't know anything about the cost structure, whether BOP spends money and then reports that it needs that same amount or more the next year. We don't know anything about how hard this is to deploy. I mean, we're at the pleading stage here. So what Alan asserts and what the plaintiff claims is that the Bureau of Prisons just stuck with the old Medical Association's view after its own ground was abandoned. Well, Your Honor, just to respond to that quickly, the change came in October, 2015. BOP gradually changed its protocol over the course of the next year. And the application from Bernier came in in December, 2015, in other words, two months after the change. The first, the decision that the district court in the first, on the first amendment complaint made the perfectly reasonable point that BOP cannot be expected to change on a dime. Can't, you know, it would take a long time. And in fact, if you look at Bernier's brief in this appeal, look at page 21 of their brief, they talk about how this qualified language in exhibit C and D, that how this new protocol make time to implement in new, in certain unique settings. They say that, let me see if I can get the exact language here. They say this was merely a recognition on the part of the panel, of the panel of the medical organizations, that implementation of the new protocol might not be instantaneous due to non-medical factors. And so if you go, if you think about what happened between October, 2015 and December, 2015, that's certainly a question of how long it takes to implement a new policy. And as I said, BOP implemented this new policy over the course of the following year, and it ended up with a different policy. And under that new policy, Bernier was eligible for treatment with these antiviral drugs. And he did get the treatment and he's been cured. The complaint says he's been cured. He had a pending request at that time though, and we know that this is a very severe disease, indeed can be life-threatening. He also, and we haven't talked about the knowledge allegation directly yet, and I hope we will, but taking that in the light, very favorable to the plaintiff would be that he had cirrhosis of the liver. And so one question is, even if it would take time for the protocol to change, why isn't it incumbent? Why wasn't it incumbent on the medical personnel to prescribe these drug-acting antivirals to someone presenting at least with some evidence of cirrhosis? Your Honor, if you look at the complaint, I'll give you the page number in a second. He was returned to federal custody in sometime in the early summer of 2015. So he was there for a few months. He was tested repeatedly. There's an allegation in here, his own complaint. I'm not quoting him from somewhere else. He quotes the clinical director, FCI Allen, where they're saying that as of the examination date, which is August, 2015, Bernier has not had any clinical symptoms of cirrhosis. So that was the evaluation a couple of months before his application was submitted. If you take it, if you look at- But just on that point there, Mr. Himmelfarb, the complaint also at JA 109, 110, paragraphs 15 and 16 includes, which Bernier not surprisingly cites in his brief, it was acknowledged by medical health providers at the facility that plaintiff's chronic noted health problems included hepatitis C and cirrhosis of the liver and cirrhosis of the liver. Right. But I think what you need to look at, you're talking, remember, we're talking about Bivens actually against the chief medical officer of BOP, not against any of the personnel who examined him at Allenwood. None of those people are defendants in this Bivens case. And so the only thing that- Because he was the decision maker. They recommended, they sent the request up the chain. That's correct. Because Allen was the decision maker. That's correct. That's correct. But his decision was based on his Exhibit A. There's a one-page Exhibit A. And if you go through this, it has a APRA test from December 15th. So it was about two weeks earlier than Dr. Allen said that he didn't qualify. The APRA was 0.40. The priority requirement to get treatment with these drugs at the time was 2.0. So that was a recent, extremely recent test. It was very low. They also came with a liver biopsy report that was a somewhat older, showed stage two fibrosis. There's a, they had a normal endoscopy the month before this request was put in. He appears to be, it says he appears to be priority level three, current APRA of 0.402. And- The difficulty is for us, Mr. Hemelfarber, I realize that there's other indicia in the record. The difficulty for us, we're certainly not medical personnel, but there is also in the record by the Bureau of Prison's own medical providers, a statement that plaintiff's health conditions included cirrhosis. And we also know from BOP's own policies that it doesn't look only at APRI, other indicia of cirrhosis are relevant. And we know the biopsies of a, you know, a massive and formless organ like the liver, that sometimes you don't get the tissue that's scarred. And so I guess just the question is not whether he wins on this record. The question is whether he's entitled to any, to proceed at all with the claim for factual development. Your Honor- Factual development. I think your question leads into the issue of Dr. Allen's awareness of this. Right. Because you're quoting something that he, there's no evidence in the record whatsoever, or any of, no allegation of the complaint whatsoever, that he was aware of that. He was, that the allegation- There is an allegation, and I understand that you take it to be, you characterize it as conclusory, but there is an allegation that Dr. Allen, as well as the clinical director, Stahl, were aware of this. And that was something that the district judge was willing to accept. But go ahead. I beg your pardon, Your Honor. But what it says they were aware of was the fibrosure scores from his time in state prison. Not any of these other things that we've been talking about. Only the fibrosure scores. That's what the allegation is about. And the point- I didn't see you arguing that the fibrosure scores didn't register a cirrhosis level of number. What we're arguing is that there are many different kinds of indicators of tests for cirrhosis. And the medical, different medical providers use different tests. They're all, you know, they can argue about which one is better than which one. But APRI is a recognized indicator. They had a reading of this, not from 2011, 12, 14, whatever the state fibrosure scores were, but from December, 2015, just two weeks before the decision was made about his priority. And so even if Dr. Allen had before him the state fibrosure scores, which is no evidence of, even if he had before him, it wouldn't make a difference. It's still a medical judgment, how to balance two different indicators, two different tests. But we don't have, I mean, I guess the question is what would permit us in light of evidence? So we have the knowledge question. We actually have to talk directly about that. But if Allen didn't know the statement that is in the medical record below, which is plaintiff's chronic health, noted problems, including cirrhosis, if that were something that Allen saw, we don't know at the pleading stage, we can't just say, oh, there's other stuff too. You know, balance it out. You know, we have to hear how those things are balanced by doctors. I have to come back to the point that there's no allegation that he knew that. There's an allegation- Okay, that's a separate issue. Fibrosure scores. So we have to distinguish between the two. That's a separate issue. So the allegation that he knew the fibrosure scores, and are you contesting that if he knew the score that he would also read it to indicate cirrhosis? I didn't take that to be an argument in court at all. He knows the score, and if he credits it over other evidence, and I realize those are all matters not to be resolved, but if he knew the score, that would be a cirrhosis score. And there were non-cirrhosis scores. And the question is that he doesn't, right, right. So there's- Non-cirrhosis scores too, and as a medical professional, you need to balance the evidence before you. And you cannot say that a medical professional is balancing the evidence before him is violating the Eighth Amendment deliberately. We're not the medical professionals, but let me just ask the knowledge question. So it was acknowledged by the providers at the facility that his noted problems included cirrhosis, and that they had, they acknowledged test results, three different test results earlier. We know this is a disease that doesn't tend to spontaneously resolve. It tends to progress and worsen over time. And we know that the Bureau of Prisons acknowledged that an APRI score is not necessary for diagnosing cirrhosis. It may be diagnosed by other means. And I hear you that you're saying just because there's one indicator and there are other tests that show to the contrary, maybe those other tests in medical judgment prevail. I hear you on that, but I'm just saying, we read the complaint, and the light most favorable, it's the plaintiff. So one indicium, cirrhosis. And yes, we know that it wasn't included in the report that went up the chain, that the reference to cirrhosis, but we also know that this is a plaintiff who acted with alacrity. He tracked the changed medical consensus. He requested this direct acting antiviral treatment as soon as it was available. He was a squeaky wheel. And just the fact that it wasn't on the paper does not exclude the possibility that there was discussion between the immediate care providers for this squeaky wheel who sent this, referred this request up the chain and the ultimate decision-maker. We just aren't in a position to say that at this stage, are we? Yeah, I think you are, because if there were any such evidence of Dr. Allen's awareness of this, Bernier would have pleaded it. There is no plea. Well, no, but I mean, I don't understand that because in your own briefing, Mr. Himmelfarb, the blue brief, you say, Dr. Allen's subjective awareness is a matter that Bernier could not conceivably have personal knowledge of. I'm quoting your brief. And in the gray brief, merely offering a conclusion or allegation that Dr. Allen was subjectively aware of the FibroChir results, a matter that Bernier could not possibly know. I mean, this is a familiar problem, right? In the legal system, when we need facts and especially facts with some expertise brought to bear, we sometimes have to proceed to discovery, don't we? Not in this case, Your Honor, because what he could have done, we mentioned this in our brief too, what he could have done was he could have said that I spoke to the clinical director at Allenwood, and he told me that he had had a personal phone call with Dr. Allen in Washington, and that they discussed the FibroChir scores. That would have been perfectly enough. We would not be here arguing that that was not good enough. The problem is when you make something up entirely like this, and again, let me say, it's limited, the allegation that he was aware is limited to FibroChir. It had nothing to do with any of the other test results or any of the other things that were done to Bernier during that several month period. It was limited to the FibroChir results. If you have no basis for saying that he was subjectively aware of it, that's not good enough. Anyway. It's a reasonable inference from treating people, knowing it, and writing it down, and the patient asking for it early, and the people, I mean, often if people refer something up for, you know, with a recommended treatment, and they get a no answer, they might well follow up and say, you know, hey, Allen, let's talk about this. You know, this guy has cirrhosis diagnosis that he's pushing on. What do we do about that? I mean, it's very possible. I think, Your Honor, I think if they had problems- Are we mixing up two issues here? Whether or not Allen, your position is Allen had, there's nothing in the pleading other than the inference that he looks at evidence generally to suggest that Allen knew about the Fibroshore test. Isn't that correct? Yes. Zero. Zero. And under ICPA, what's your analysis? Oh, this is that the allegation that he was aware is a conclusory allegation that has no factual basis for it. And so it should not be considered, assumed to be true. When- Can I ask you to give, can I ask you to, this goes back a little bit to the whether there was any non-cost reason for the policy. Can you give us an example of someone outside of prison at the time, December, 2015, that this decision was made, who would have been denied this treatment under the medical associations protocols? Under the old one or the new one? The new one. The revised one that was in effect in December, 2015. Someone outside of prison with Bernier condition who would have been denied this treatment? I suspect there are people, I'm just wondering who they are. You skim through the exhibit D, it goes through a whole bunch of different categories of people. Some of whom would not be given the drug here. That's why I talked about unique settings and I talked about continuing concern about availability and costs. So yes, there are some people, maybe the availability might be in remoter areas, rural areas of the country. There are people who are drug users who probably would be medically indicated not to get this drug. There's a section on HIV-infected men, incarcerated persons, persons on hemodialysis. So yes, the policy itself sets forth a bunch of different situations in which non-prisoners would not get this treatment either under the new policy. Council, may I ask a question about the law cases? Seems to me, is it fair for me to conclude there's a conflict between the third circuit and the 11th circuit on roughly similar cases? Well, are you talking about the Abu Jamal case? Yes, Jamal in the third circuit and Hoffer in the 11th circuit. The answer is that different courts have handled this a little bit differently, but yeah, I mean, I think that- Well, Hoffer makes the point that to make out a case of deliberate indifference, it would have to be more than gross negligence. Well, that's what Farmer said, I mean- And indeed, and Estelle versus Gamble, Justice Marshall made clear that malpractice would not be a case of deliberate indifference. That's correct, Your Honor. And so, I think it was Farmer's case that said that the state of mind for a deliberate indifference case is criminal recklessness. And so malpractice is definitely below that standard. It doesn't rise to that level. And so, if there's evidence that a medical professional could reasonably balance, then even if he was aware of the Fibershore scores, then he should have had qualified immunity here. Because in the third circuit in the Jamal case, the language which the district court relied on is or prevents an inmate from receiving recommended treatment for serious medical needs. Do you disagree with that? That sounds pretty inconsistent with Estelle versus Gamble to me. Well, I mean, I think you would still, in that situation, you would still need to have a state of mind of criminal recklessness. Would not be enough to think of it as negligence. It had to be criminal recklessness to get to the Eighth Amendment violation. And so, whether it's consistent or not, I think you have to read it to include the criminal recklessness subjective standard. Yes, that's why I'm inclined to think the 11th Circuit view is quite different from the third circuit. Okay, yes. I'm certainly willing to accept that, yes, Your Honor. So, Mr. Himmelfarb, we talked about the protocol and that it was something like a year later that the Bureau changed its protocol after the medical associations came out with a new recommendation that virtually all patients should get and would benefit from direct acting antivirals. And one can imagine all kinds of reasons that might take the Bureau some time. How do, but how do we at the pleading stage, help me out, how do we evaluate that delay? If you had, and, you know, I understand your position on this plaintiff, but if you had a patient who was at the threshold of cirrhosis wasn't under the old protocol eligible, but really would benefit and needs it to prevent permanent liver scarring, but the Bureau takes time, like how do we think about that at the pleading stage? Well, Your Honor, I just wanna emphasize what you said at the beginning, which is that we're not talking about this case because in this case, it was only two months after the change for the medical associations and Bernier himself in his brief at page 21 admits that it was gonna take some time to implement the new policy. So going to your more specific question, BOP is a very large organization. I have to tell you, it's the entire federal prison system. And as of 2015, there were approximately 200,000 prisoners in many different institutions across the country. And so organizing medical treatment for the prisoners is always very difficult. And when it's a new treatment, it's especially difficult. You're gonna need things that you're gonna have to make sure that your medical staff is properly trained. You're gonna have to... I mean, there are a whole bunch of considerations that go into it. And so it's not like a doctor's office. No, I understand. I'm just asking for help. How do we... Because it seems to me a very factual issue. And if the Bureau were here with a couple of witnesses explaining how they take up new advice, how they expedite, how they deal with people who may be harmed during the bureaucratic process, that would be an easy case to credit. Well, we don't have that. And so I'm asking you at the pleading stage, at the pleading stage, what are the tools? What's the best case for us to accept a delay that reading the complaint in the light most favorable to plaintiff could be a very damaging delay. Let me just go back to the point I've made before, because I think it fits in here to the response to your question. The question here is not a delay of a year. The question here is a delay of two months because the only issue here has to do with the treatment of Bernier or the request for treatment for Bernier in December, 2015, only two months after the change. That's not quite right. I thought your own position was that this was a denial at the time, but that because they were continuing to monitor and manage every case, including Bernier's, that if after four months or six months or eight months, they were able to provide it, they would. So I'm pointing to the delay of a year because that's when they changed the protocol and actually give them treatment. That's right, Your Honor. But I don't see that as inconsistent with what I'm saying. The only issue here is, was the denial in December, 2015, a violation of the Eighth Amendment? And the continued denial until it was given. I think the issue is the denial in 2015. I thought Dr. Allen's position was we were appropriately monitoring him. Well, that's correct. But the legal issue here is what happened in December, 2015. I'm not sure this is actually responsive to the question. How do we, are there cases, is there a doctrinal way to help us think about and excuse a year's delay on the government's part, assuming there will be some patients during that year who had the medical association's protocol been more quickly implemented, would have avoided serious and permanent harm to their health or even death? Your Honor, I think if you look at the August, 2019 opinion of the district court when it granted qualified immunity on the First Amendment complaint, there's a discussion in there about the change, the rapidly evolving change in the medical understanding of this disease. I understand there's a common sense way to reason it through. I'm asking for legal and doctrinal authority that gives us a way to make this point. Legal, like how do we, what's the legal framework for us to excuse governmental delay? I understand there must be in every case. This is a complicated bureaucracy, as you said. And I think I'm trying to actually ask. The doctrinal rubric is clearly established. There's no clearly established violation of the Eighth Amendment in this case. And that's the rubric. That's the doctrine. Counsel, may I ask about the monitoring? What did the monitoring consist of? Well, prisoners are often, especially ones with recognized diseases are certainly able to go and have tests done at their institution. So it's that kind of monitoring to see whether the condition is changing for the worst, to see whether their priority would change. Was there any indication that his situation was changing for the worst? He was in category three, right? That's correct. And how was category three designated? What were the rules for category three? Yeah, what's the description? Well, I think it's best if I read you from and tell you what the page number is and refer you to that page. Category three is on page, joint appendix page 128. What it says is intermediate priority for treatment, stage two fibrosis on liver biopsy, APRI score of 1.5 to less than two, diabetes mellitus and porphyria cutanea tarda, which I admit I don't understand, but there are various medical indicia that would put an individual in prison in this category three. Was he ever, was there ever an indication that he went up to category two or one? Under the old protocol, no. What happened is that BOP changed the protocol and it allowed treatment of people who were not- No, I understand that, but was there ever a change in his status from before the new protocol came into effect? No, I'm certainly not alleged in complaint, no. Other questions, Judge Walker? Judge Silberman? No other questions. All right, thank you very much, Mr. Himelfar. We took you with largely with my questions way over your time, but we will give you some rebuttal time after we've heard from Mr. Howard. Thank you. Mr. Howard, you may proceed when you're ready. Thank you, Your Honor, and may it please the court, Theodore A. Howard for the appellee, Jean-Gabriel Bernier. Given the nature of the questioning of Mr. Himelfar, Your Honor, although I had intended to focus initially on the alternative ground that we believe would suffice to affirm the district court's decision to deny the motion, namely that Estelle v. Gamble in itself is sufficient to establish the clearly established right at issue here, I'll try to focus some of my time on the second issue,  which is the cost of evidence at the pleading stage with respect to, A, a cost basis for the determination by Dr. Allen to deny him treatment in reliance on the then existing BOP protocol. And secondly, Dr. Allen's knowledge with regard to alternative information to the APRI test results sufficient to alert him to the fact that Mr. Bernier needed treatment and that such treatment was denied. Do I take your position to be that the initial protocol was itself an indication of deliberate indifference? No, Your Honor, I can't say that because although it seems apparent that the BOP protocol that was in effect as of December 2015, upon which Dr. Allen relied, was a bureaucratic administrative protocol basically designed to ration treatment to those most in need while- I read your argument as indicating that the initial protocol itself was an indication of deliberate indifference. Well, Your Honor, I think- It became deliberately indifferent once the medical associations had made their new- No, I was wondering, I was really asking whether your position was the initial position. I understand your question, Your Honor, and I understand the basis for it. The basis would be, for making that contention, would be that in designing a protocol that was premised upon the idea of rationing treatment and only providing it to those in most serious need under circumstances in which this disease, hepatitis C, is a progressive disease that once it starts, doesn't really stop until it's been treated, that the BOP was in effect making a conscious decision that a certain number of people with a progressive disease were not going to be treated until they reached a certain level of severity. Yes, so I understood your position. It is, as I stated, you believe that the initial protocol itself was an indication of a deliberate indifference because it relied on cost factors. I think it could certainly be characterized as such, Your Honor, but that is not- Well, that's the way you're characterizing it. Well, that is the way that we've described it, but that is not the premise for our position. Our position is that irrespective of whether or not the protocol was constitutionally flawed prior to the change in the standard of care, certainly after the standard of care was altered such that the authoritative medical authorities that- Isn't the step, even in the medical authorities acknowledge there were the difficulties in the prison setting? The medical authorities- I think that's just a statement of fact, Your Honor, in the policy statement. It goes to the protocol, doesn't it? Well, Your Honor, I think that the medical panels were merely recognizing that in an ideal world, these drugs would be implemented immediately and everyone who has hepatitis C would receive them. And the fact is that that probably can't happen. And it probably can't happen in a variety of circumstances, including but not limited to the fact that prisons may have constraints on their ability to implement immediately. Where do you see that? I actually, the one place in the new medical protocol where incarcerated persons or prisons are directly discussed, it's a JA 142, where it talks about coordinated treatment efforts within prison systems would likely rapidly decrease the prevalence of HCV infection in this at-risk population. And there's nothing there specific to either bureaucratic delays or shortage of staff or even cost referenced specifically with requests to prison. So I actually don't see that. And I do see which Mr. Himmelbarb's brief quotes that on the sort of cover press release or whatever it is, the first page, JA 130, that the medical associations acknowledge that because of the cost of the new drugs or regional availability of appropriate healthcare providers, a practitioner may still need to decide which person's, that's a very general statement, not at all keyed to prison. So when you talk about some acknowledgement of bureaucratic challenges in prisons, which aspect of the medical protocol are you referring to? I'm not, your honor. It's our position that as of October of 2015, the prioritization protocols that had previously existed or been endorsed by the medical panels on the grounds that reliance, pure reliance on clinical trials was inadequate to give the blessing to the widespread implementation of this new course of treatment. It's our position that that was an unequivocal change in the standard of care. The fact that the panels recognized that there might be some instances in which implementation of the new standard of care might be, there might be impediments was not at all stepping back from their determination. This is the course of treatment for people with hepatitis C. How quickly does the Bureau of Prisons need to integrate a new medical consensus into its protocols for its, in your view, for its action to avoid deliberate indifference and what case can you point us to that's most supportive of your position? Your honor, the case law that has emerged since the direct acting antiviral medications came to the fore has been quite variable with regard to the views of courts in terms of how quickly implementation should have taken place. So I do not have a definitive answer for you with regard to- But you're arguing, you're asking us to make a decision. How quickly do you believe, are you urging us to hold that BOP needs to act in integrating a new medical consensus and what's your best case? Your honor, I think that the, well, certainly our position is that by the end of December of 2015, Dr. Allen, who, you know, in his declarations asserts his own knowledge and expertise with regard to hepatitis C treatment, that if in fact, as we allege, he had sufficient evidence to know that Mr. Bernier had cirrhosis, notwithstanding the APRI tests, then certainly it's our view that he should have acted in accordance with the new medical standard of care and provided Mr. Bernier with treatment. Is the key to your case that you think he was mischaracterized as in level three? No, your honor. The level three characterization was appropriate. By the measures that by which they make those determinations, we have no evidence that that was an inaccurate classification, your honor. Our position is- You're not making any allegation to that effect. I'm not, your honor. Our position is that once the standard of care change- Excuse me, let me just pursue. If in category three, if I may speak roughly, a person in category three was not in danger of life-threatening situation, right? They certainly, under the classification measures that were used to place Mr. Bernier in category three, he was not regarded as an immediate danger of the most severe consequences of hepatitis C. So you're not arguing that the existence of the Fibroshore test results alone meant that Mr. Bernier actually had cirrhosis. That's not your argument. Your argument is a more nuanced argument about the protocol and how quickly there's uptake of the new standard of care. Your honor, I think that's right. I mean, essentially after the standard of care changed, the continuing reliance on this classification scheme as the basis for determining who gets medication when was deprived of its foundation. And so, I'm sorry, go ahead. Why shouldn't we say this? Your case depends on, according to what you just said, the argument that BOP is continuing reliance on its previous system was an Eighth Amendment violation. And you said a few moments ago that courts have been quite variable on that very question, which seems to suggest that even if there was an Eighth Amendment violation here, it wasn't a clearly established Eighth Amendment violation. And that maybe is enough for us to just say that and move along. Your honor, our position with respect to that is that there was, from Estelle versus Gamble on, a continuum of decisions by the courts, the federal courts with regard to Eighth Amendment claims, including hepatitis C cases prior to the advent of the emergence of direct acting antiviral medications. Forgive me for interrupting you. But in Estelle versus Gamble, Justice Marshall's opinion went out of his way to make clear that malpractice would not be adequate to show an Eighth Amendment violation. That's correct, your honor. And in the 11th Circuit, even gross negligence would not be adequate to allege an Eighth Amendment violation. Apparently, your honor, on the basis of the case you made reference to during Mr. Himmelfarb's argument. Well, that follows up on my colleague's point. How can it be argued then that there was a clearly established right here? A constitutional right to get the latest best treatment? And your honor, my answer to that is that, as cited in our papers, there are cases that preceded the advent of this new medical treatment addressing claims by prisoners of denial of care for hepatitis C on the basis of bureaucratic administrative protocols similar in nature to the BOP protocol that was in effect in December of 2015, where courts held that your reliance on this protocol in ignorance of the particular circumstances of this prisoner constitutes deliberate indifference. Suppose I was a private citizen and went to a doctor with the concern that I had cirrhosis of the liver. And the doctor in December of 2015, or let's say February of 2016 said, you know, I'm a little worried about this new treatment and I'm gonna delay it for a while, maybe for four or five months, if you don't get any worse before I prescribe it. What would you think? Do you think that's a case of negligence? I would say it would be under the standard of care that had been established by the medical panels as of October, 2015. So you think you make out a case of negligence? I think under those circumstances, a case for medical malpractice in the nature of negligence could be made out. Yes, Your Honor. Mr. Howard, you made an allegation that the Bureau of Prisons does not in actual practice perform or accept Fibroshore. What's the basis and the import of that allegation in your case? It wasn't entirely clear to me whether that helps you and if so, why? That the Bureau doesn't in actual practice perform or accept Fibroshore. Your Honor, the premise is that notwithstanding their own written policy indicating that the APRI score is not the be all and end all if there are other indicia of cirrhosis. And the fact that in this instance, we contend that Dr. Allen knew of Fibroshore results but ignored them is an indication that they notwithstanding their own policy saying that other types of evidence can be accepted, they don't actually look beyond APRI. What is your allegation? Excuse me. What is the allegation that Dr. Allen knew about the Fibroshore test? That is what it is, Your Honor. We have alleged that our belief, Mr. Bernier's belief that Dr. Allen knew of his Fibroshore results. Well, what do you have other than a bare conclusion? What do you have to support that? At the pleading stage, we don't have anything, Your Honor. Well, how do you get by Iqbal then? Well, Your Honor, I think we get by Iqbal on the same basis as the plaintiff slash petitioner in Erickson versus Pardis as decided by the Supreme Court got by Bell Atlantic, which was the predecessor of Iqbal and basically articulates the same standard. That was a pro se case. It was a pro se case, but that was not the premise upon which the Supreme Court reversed summarily a decision that the magistrate judge, a district judge and the 10th circuit had all held that the plaintiff's allegations were inadequate. Supreme Court said, no, they're not inadequate because under rule 8A2, he said he's made clear allegations that are sufficient to put the defendant on notice as to what he's claiming. Mr. Howard, what are we supposed to do with a decision from a U.S. district court in New York that had adopted a magistrate judge's report and a suit Mr. Bernier brought against the state medical doctors who were responsible for his care up until August of 2015. And what the decision says is, and this was on summary judgment. So this was not at the pleading stages. It says that Mr. Bernier failed to show as of August of 2015, that his condition was such that he faced a substantial risk of serious harm if untreated, much less that his infection was causing him to experience any serious symptoms or ill effects. Now I recognize that four months passed between August, 2015 and December, 2015 when Dr. Allen made his decision here. But do you think that we're allowed to consider what was found in that U.S. district court case in New York and not only consider, what would you say to the possibility that it has some kind of a preclusive effect? Judge Walker, I have to confess that I am not familiar with the district court decision to which you make reference and I guess neither apparently was Mr. Himmelfarb because I'm confident that he is quite capable and would have cited it to us. I didn't find it myself either, I have to confess. My crack lock work found that. I thought that was cited. Anyway. Without more knowledge as to the specifics, I couldn't really say whether it is res judicata or collateral estoppel, but if it went to the question specifically of hepatitis C, I guess that my premise would be that that decision was based on a set, a state of, I'm sorry, a body of evidence available to that court at that time with respect to a progressive disease. And so it wouldn't necessarily preclude Mr. Bernier from having initiated this case on the basis of the BOP's decision. Okay. So I guess I would just say in conclusion that the qualified immunity defense asserted by Dr. Allen has not been rejected. The district court has held that there are allegations in the complaint worthy of recognition. Dr. Allen disputes those allegations. The case should proceed to allow for some exploration with regard to the validity of Dr. Allen's denials. The district court is clearly in a position to exercise its discretion to regulate the conduct of discovery in a way that minimizes inconvenience or consumption of time on the part of Dr. Allen until we get to the point where Mr. Bernier has either established a basis to depose Dr. Allen or the documents that have been acquired through discovery fail to validate Mr. Bernier's allegations, in which case we probably don't even get that far. However, the allegations were certainly equivalent to those regarded as sufficient in Erickson, in Abu-Jamal, in the decision of the Third Circuit. And this court in the case of Nafab Safavi versus Glassman 637 F3-311, a case which we cited in some of our papers in the district court and certainly should have cited in our brief on appeal. This court has certainly recognized that qualified immunity defenses sometimes have to wait adjudication until there has been a development of disputed facts, a record with regard to disputed facts sufficient to allow the court to determine whether or not the knowledge of the defendant indicates that a clearly established right was or was not violated. And we believe that's the case here. And on that basis, we would request that the district court's decision to deny the motion to dismiss be affirmed. Thank you. Thank you, Mr. Howard. Now, Mr. Himmelfarb, we've offered you some time for rebuttal. Okay, I have a couple of quick points if the court can stand it. First point is that Mr. Howard was talking about how the new protocol for the medical organizations was a change in the standard of care and that Dr. Allen should have followed it. That's not the Eighth Amendment standard. Eighth Amendment standard is deliberate indifference. That's a malpractice standard. I think Judge Silberman may have been getting at that point, but that's a malpractice standard, not a deliberate indifference standard. Second point is Mr. Howard mentioned variable court decisions. What do you mean I may have been getting at that? I was directly getting at that. I wouldn't want to presume, Your Honor. Mr. Howard talked about variable court decisions. Well, that by definition means that it's not clearly established. You need more than variable court decisions. This case, remember, just to get back to this basic point, this case is a Bivens action against Dr. Allen. There's no allegation Dr. Allen was responsible for this policy. If Bernier wanted to deal with the policy, he could have brought an injunction suit. In fact, he did that originally. And this court, I believe in its decision on appeal from the denial of preliminary injunctive relief said that it was moot because he got the relief. He was given the treatment. And last, I don't know, maybe getting to a little bit trivial points here, but the Erickson case in the Supreme Court, there were a lot more allegations going on in that case than there are here. There were allegations about a syringe that there was a different treatment, that there was some syringe used, that the prison officials blamed the plaintiff for altering the syringe to use for drug injection. So there were a lot more factual allegations. It wasn't just that it was a pro se plaintiff, which it was, and that's relevant, but it was also a whole bunch of more specific allegations. So unless the court has further questions, then we would ask the court to reverse here, to vacate and remand for required qualified immunity to be granted. Thank you, Mr. Himelfarb. Thank you, Mr. Howard, for your pro bono service. The case is submitted.
judges: Pillard, Walker, Silberman